# EXHIBIT 4

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, Sc. SUPERIOR COURT

WAYNE DEMARCO, et al )
)
vs ) PC/04-0117
)
LEO DOIRE, et al )

**HEARD BEFORE**

**THE HONORABLE JUSTICE DANIEL A. PROCACCINI**

**OCTOBER 30, 2006**

**APPEARANCES:**

MARK DANA, ESQUIRE,.............for the Plaintiff

With Whom Appeared ROBERT D'AMICO, ESQUIRE

MICHAEL DELUCA, ESQUIRE................for the Defendant

JEFFREY PINE, ESQUIRE.................for the Defendants

COPY

# CERTIFICATION

I, Sandra J. Delaney, hereby certify that the succeeding pages 1 through 24, inclusive, are a true and accurate transcript of my stenographic notes.

Sandra J. Delaney
Court Reporter

COPY

OCTOBER 30, 2006

AFTERNOON SESSION

THE CLERK: Your Honor, the matter before the court is PC/04-117, Wayne DeMarco vs Leo Doire.

Will counsel identify themselves for the record.

MR. DANA: Mark Dana, on behalf of the plaintiff.

MR. D'AMICO: Bob D'Amico, for the plaintiff.

MR. DELUCA: Michael DeLuca, for the defendant.

MR. PINE: Jeffrey Pine, for defendants Virginia Transportation and Leo Doire.

THE COURT: The Court has two motions before it, a motion for new trial or remitter and a motion for cost allocations. I will take the motion for new trial first.

The matter before the court is the defendants' motion for a new trial and/or remitter. This matter was tried before a jury from September 18 through September 22, 2006. Upon submission of the matter to the jury, the following verdicts were found in favor of the plaintiffs:

Wayne Demarco, one million eight hundred seventy-three thousand seven hundred ninety-five dollars,

Lisa Demarco, one hundred thousand dollars,

Braedyn DeMarco, fifty thousand dollars,

Chayce DeMarco, thirty thousand dollars.

The plaintiffs' claims against the defendant arose out of a one vehicle accident which occurred on September 9, 2003. The defendant, Doire, lost control of his pick-up truck, struck two telephone poles and the front seat passenger plaintiff, Wayne DeMarco, suffered multiple injuries to his right leg.

At the commencement of this trial, the defendants had stipulated to liability for this accident, and the matter was tried on the issue of damages only.

The standard of review on a motion for new trial is succinctly summarized in the recent Supreme Court case, Candido vs University of Rhode Island at 880 A.2d 853, decided in 2005. In that case the Supreme Court stated, "It is well settled that when considering a new trial motion, the trial justice's role is that of superjuror." And I am going to omit any citations. "The trial justice must review the trial evidence in light of the jury charge, and he or she must independently assess the weight of the evidence and credibility of the witnesses, drawing all reasonable inferences therefrom. The trial justice's duty is to consider in the exercise of his independent judgment all of the material evidence in the case in the light of his charge to the jury and to pass on its weight and the credibility of the witnesses. In carrying out that

function, the trial justice should be guided by the following principles: 'The trial justice may accept some or all of the evidence. He may reject evidence that is impeached or contradicted by other positive testimony or circumstantial evidence. Or he may disregard testimony that contains inherent improbabilities, contradictions or which is totally at variance with undisputed physical facts or laws. He may also add to the evidence by drawing proper inferences.'"

The Supreme Court went on to say, "This Court's language in Barbato vs Epstein over forty years ago expresses with enduring cogency what is the trial justice's role once he or she has completed the process of reviewing the trial evidence, a process that the Court in Barbato described as being one of 'acceptance, rejection and addition.'"

The Court then said, "On that evidence the trial justice decides whether to approve the verdict even against doubts as to its correctness because the evidence is nearly balanced or was such that different minds can naturally and fairly come to different conclusions thereon, or, in the alternative, set it aside when his judgment tells him that it is wrong because it fails to respond truly to the merits of the controversy and to administer substantial justice and is

against the fair preponderance of the evidence."

The plaintiff, Wayne DeMarco, presented seven witnesses in support of his claim for compensation for bodily injury sustained on September 9, 2003.

The plaintiff took the stand and described the nature, extent and duration of his injuries in detail. He related that on the evening in question, he was seated in the front passenger seat when the defendant's vehicle struck two telephones poles in succession which trapped him in the vehicle. Following impact he remained conscious and observed chaos inside the vehicle. There was yelling, screaming, and he remembered thinking he was going to die. He described the impact to his right leg "like taking a saw and going through my leg," and further stated that the one hour he was trapped in the vehicle "felt like a lifetime." While in the vehicle waiting to be extricated by rescue personnel using the jaws of life, he recalled wondering who would care for his children.

His next recollection after the accident was waking up at Rhode Island Hospital, heavily drugged. He testified he was afraid to look at his leg because he didn't know if it was there or not. The plaintiff was hospitalized for approximately one month during which he was confined to bed and heavily medicated for pain with

drugs such as demerol, oxycontin and morphine. At that time he described his pain as a ten on a scale of one to ten.

Plaintiff DeMarco described his emotional state as "a wreck" and depressed. He also described his situation as a "nightmare that was reality," and he felt "humiliated like a baby."

The plaintiff, Mr. DeMarco, and Drs. Trafton, Edstrom and Allen described in detail the nature of the multiple injuries to the plaintiff's right leg and the five surgeries needed to repair his injuries that were performed by these doctors.

It should be noted both Dr. Trafton and Dr. Allen described plaintiff's right leg injuries in their direct examination during the initial stages of treatment as limb threatening and potentially life threatening. Dr. Allen also expressed additional concern regarding a high rate of infection, which he placed at fifty percent, which could complicate treatment.

Dr. Trafton, an eminently qualified and experienced orthopedic surgeon, who was Dr. Allen's supervisor, described the injuries as "two levels of tibia unsupported and very difficult to treat." He further noted that plaintiff had six fractures below the knee.

Dr. Allen described six separate surgical

procedures performed on plaintiff's right leg. The first procedure, a series of incisions called fasciotomies, where made to release the swelling of muscle tissue in the plaintiff's leg. They also were made to maintain blood supply and to avoid the death of tissue in the area of the injuries. The second and third surgeries performed on September 11 and September 13, 2003 were debridement of the open tibia wound and the eventual closing of some of the fasciotomies that had been performed previously.

The fourth surgery by Dr. Allen several days later was more of the same debridement and closing fasciotomies. On September 17, 2003 plaintiff underwent a fifth surgery where two long screws were inserted into his heel to stabilize fractures in that area. Dr. Allen opined that the arch of plaintiff's foot was lost and the subtalar joint, which provides ankle motion, was obliterated. He concluded these effects of the foot injuries were permanent. He also described consistent complaints by Mr. DeMarco of foot pain and decreased sensation in his foot and prescribed over his course of treatment of the plaintiff numerous pain medications such as Percocet, oxycontin and also prescribed Livorno which is a blood clotting preventative measure. Also, in the course of surgery he performed was the

replacement of the rods in the bone of the plaintiff's lower leg to stabilize the numerous fractures.

The sixth surgery by Dr. Allen was a bone harvesting procedure on January 12, 2004 which transferred bone and marrow from the plaintiff's hip and pelvis to be implanted in his lower leg.

The seventh surgery was a free tissue transfer and transplant of the plaintiff's rectus, abdominus muscle which runs from the pelvis to the rib cage. And this surgery was required to cover the soft tissue deficit or open cavity over the fracture site of plaintiff's lower right leg which was having difficulty healing and closing itself. This complex procedure required four surgeons, and lasted approximately ten hours.

In addition to the abdominal scarring and deformity of the plaintiff's right leg which resulted from the surgery, several other consequences also resulted from this abdominal surgery. The plaintiff was left with reduced abdominal strength which affected his ability, for example, not only in getting out of bed but getting up from a reclined position, and the plaintiff was left with a hernia or weakness in the abdominal wall in the area of this surgery. Dr. Edstrum acknowledged such condition would be uncomfortable to the plaintiff and that repair of this condition would cost ten thousand

dollars.

The plaintiff, Mr. DeMarco, testified he felt particularly upset and depressed when he learned of the major surgery that would be needed that the Court just referred to in January of 2004. His wife, Lessa DeMarco, described it as "back to square one, starting all over again." There was substantial direct examination and significant exploration on cross-examination about the nature, intensity and limiting effects of the plaintiff's injuries and any pain associated with these injuries. There were references to plaintiff's pain as being, this is on cross-examination, there were references to plaintiff's pain being rated as four out of ten upon his discharge from Rhode Island Hospital, and there was also reference to various types of nurses' notes that documented his pain at six or seven out of ten during his hospitalization. The defendant asserts these numbers showed well controlled or minimal to moderate pain. The Court, however, cannot ignore Dr. Allen's professional opinion that six or seven out of ten on a medical chart assessing pain levels means the pain is not well controlled. Also, these levels were noted while the plaintiff was on a continuous drug regimen, orally, by injections and by IV pumps at the various stages of his

hospitalization and recovery following the surgeries just dealt with.

Finally, the obvious visual and medical documentation of the plaintiff also supports the finding that significant pain and discomfort and suffering accompanied the plaintiff's lower leg injuries.

The defendants challenge the award to plaintiff, Wayne DeMarco, and seriousness of the injuries by demonstrating his ability to return to work at VEH Transportation Company, and that his return to part-time work ten to twelve hours a week by March 2004 and return to full-time work by June 2004 were offered to somehow either diminish the seriousness of the injuries or diminish the wage claim itself. There was credible testimony this Court finds, however, that his initial return to work was in a limited capacity as a dispatcher and that his activities when he returned on a full-time basis were not as complete or strenuous or physically demanding as what he had done in his employment prior to the accident. Also, plaintiff's father, who was formerly an owner of this company and was semi-retired prior to the accident, was of great assistance to the plaintiff in his return to his former employment and in keeping the business going in the interim. All of this information when weighed against the nature and extent

of the plaintiff's leg injuries does not significantly diminish the gravity and long term effects of this right leg injury.

It must be noted that a fourth physician, Dr. Ritter, who took over plaintiff's care when Dr. Allen finished his fellowship and left Rhode Island Hospital, gave plaintiff a twenty-two percent whole person impairment rating. He corroborated the testimony of Dr. Trafton and Dr. Allen and their opinions that the plaintiff has extensive and permanent impairments in the form of restricted motion of his right ankle, of his sub-talar motion, which is side to side movement, and he has a widened and shortened heel bone as a result of the trauma suffered to his foot.

Dr. Ritter also opined that he did not anticipate more improvement and expected plaintiff to experience some arthritic changes at the trauma site and his general condition in the area of the injury to decline in the future.

The defendants chose to challenge and explore the various medical information and opinions of plaintiff's physicians through cross-examination. They chose not to present any independent evidence or physicians testimony refuting or diluting the many opinions of plaintiff's doctors, particularly regarding permanency in this case.

The cross-examination of plaintiff and his treating physicians was thorough and competently handled, but when considered in light of the evidence as a whole, were a team of highly competent and experienced physicians who actually all shared the same assessments and evaluations of plaintiff's condition and agreed on issues of pain, permanency and future expected consequences of this injury. The cross-examination of the plaintiff and these doctors did not undermine these opinions to an appreciable extent.

This jury and this Court has before it a plaintiff, Wayne DeMarco, who incurred medical expenses in excess of two hundred sixty thousand dollars, also has evidence before it that he had a period of approximately six months in which he had either a complete loss or diminishment of earning capacity, which the Court will state on the record that I think the loss of earning capacity aspect of the case was probably the least persuasive and less compelling aspect, and the overall manner in which the case was presented was a fifty thousand dollar component of a damage request that was in the neighborhood of two point four million. But whatever it's thoughts about the wage claim and challenge to the wages and what the extent of activity was of the plaintiff during that period, the strength of

that evidence does not in anyway, in the Court's eyes, undermine that it was not of such character that it would change the reality of the obviously devastating injury to the plaintiff's right leg. And most importantly, the record clearly establishes that we have a plaintiff who has a 34.5 year life expectancy with certainly irrefutable life-long injuries, some of which are expected to worsen as time passes, and those facts were essentially unchallenged on the record as the Court sees it.

The jury did not and the Court cannot ignore plaintiff's permanent injuries which include, multiple areas of scarring, multiple areas of right lower leg disfigurement, permanent limitations in ankle motion and the twenty-two percent whole person impairment rating and a medical opinion by Dr. Ritter that the plaintiff's condition is expected to decline and that he is expected to develop arthritis at the injury site in the future, and earlier than he would have in that area had he not been injured.

All of these life-long manifestations of the injuries as described must be coupled with the Court's review of the pain control measures and pain experiences, and as he testified, embarrassment and humiliation, all previously alluded to in this Court's

decision.

The award of one million eight hundred seventy-three thousand seven hundred ninety-five dollars does not shock the conscience of the Court. This award was not the product of passion, prejudice or sympathy, and based upon the Court's independent review of all the evidence is not grossly excessive.

There is no doubt that a permanent injury of this significant magnitude can be subject to wide variations or disparities in determining the monetary value of such injuries. This is a case where different minds could naturally and fairly come to different conclusions as to what would constitute appropriate compensation. The jurors could have awarded less, but they conceivably could have award more. The plaintiff had requested two point four million, and the jury awarded one point eight plus for the plaintiff, Wayne DeMarco.

This Court believes the credible evidence offered by the plaintiff and his doctors and the reasonable inferences established by such evidence support the award by a fair preponderance of the evidence. It is a fair and just response to the evidence presented.

As to the three consortium claims of Lessa, Braedyn Chayce DeMarco, the jury returned verdicts of one hundred thousand dollars for Lessa, fifty thousand

dollars for Braedyn and thirty thousand dollars for Chayce. The testimony relating to the loss of society and companionship of Wayne DeMarco by these plaintiffs was provided by Wayne and Lessa DeMarco.

At the time of the accident, September 9, 2003, Braedyn was three years old and Chayce was one. Plaintiff Lessa DeMarco testified the first time she could bring the boys to see their father was in early October. She tried to visit on "good days" when Wayne DeMarco was not delirious and heavily medicated. She described the difficulties and confusion of explaining to Braedyn, three years old, that daddy was in an accident. She expressed worry that the children might not recognize Wayne or they might see his injured leg while visiting at the hospital. She stated the thirty days Wayne was hospitalized were "horrible." She had difficulty sleeping during this period and her mother and father helped with the children during that period.

Wayne testified that he missed seeing his boys and missed Chayce's first birthday and first step due to his hospitalization. He described his feelings at this time as "depression, humiliation, like a blank sheet."

Lessa described the boys interaction or attempts to interact with their dad during recuperation at home. She related while Wayne was happy to be home, he felt

helpless. Braedyn would tell her "I don't like daddy being broken." She also tried to keep the boys physically controlled around Wayne or keep them away from his injury site so as to not impede his recovery.

Wayne was portrayed as being an active father with the boys prior to the accident. Lessa described activities at the time such as flying kites, climbing jungle gyms and generally just running around with his children. Since the accident his relationship was described by Lessa as more subdued, no running or little running, no tackling, no T-ball and his ability to just participate with the children in a game or activity such as swimming or skating lessons with his boys is curtailed by his right leg injury.

Lessa summarized the injuries effect on her family: "It subdued our family, still do everything together," but there are limits imposed by Wayne's limitations. Lessa also related behavior by her children that shows the pre-occupation and clear effect this injury has had on the boys and their perception of coping with their own injuries. Lessa explained that when the children have a minor injury, such as a toe injury while swimming, they define it in terms of their father's broken leg.

Finally, Lessa and Wayne related the household and

personal hygiene services provided by Lessa as a result of Wayne's lack of mobility during the first three to six months following his injury. Wayne used a wheelchair or crutches around the house and he was on various medications, both pain and clot medications, which required the close supervision of Lessa when he was home.

The Court finds the testimony of Wayne and Lessa DeMarco relatively unchallenged. This testimony was credible and supported by the medical evidence in the record relating to what Wayne could or could not do at the time as described by the Court.

The amounts awarded to Lessa, Braedyn and Chayce DeMarco did not shock the Court's conscience and are not the product of sympathy, compassion or prejudice. Such awards may be subject to wide variations, but their awards fall within a reasonable range. And based upon evidence in the record, those awards are supported by a fair preponderance of the evidence and are fair and just responses to the evidence in record.

Accordingly, the defendants' motion for new trial and remitter with respect to all verdicts returned in this case is denied.

THE COURT: Now, on the motion for costs allocation. The plaintiff filed a motion for costs

allocation against the defendants. The defendants have objected in part to this motion. The Court has thoroughly reviewed the plaintiff's motion and all the attachments which purportedly document the expenses listed in his motion.

Rhode Island General Laws 9-22-5 provides that a prevailing party in a civil action is entitled to recover costs "except where otherwise provided or as justice may require in the discretion of the Court." In Kottis vs Cerilli at 612 A2d 661 our Supreme Court stated, "Costs are normally considered the expenses of serving another party, including filing fees and fees to serve process." The Court also clearly stated that expert witness fees are not costs. And in a subsequent case, Beilechi vs Boissel 715 A2d 571, a 1998 case, the Court stated that deposition costs are discretionary with the Court. Finally, all costs awarded must be reasonable and necessary to the plaintiff's action.

In applying these principles to the plaintiff's request, the Court is constrained to reduce the plaintiff's request by seven thousand five hundred thirty-eight dollars and eighty-nine cents. Specifically, the Court denies reimbursement for Mr. Dana's US Air fare in the amount of three hundred sixty-nine dollars and seventy cents, reduces

Dr. Allen's US Air fare from one thousand five hundred nineteen dollars and nineteen cents to five hundred dollars as this Court find the doctor's first class air fare to be unnecessary and unreasonable. And lastly, the video services and technical expenses from Power Showz and High Impact in the amount of five thousand dollars and eleven hundred fifty dollars are also denied. While they are certainly desirable and effective in demonstrating the plaintiff's injuries, this Court cannot say that other less expensive methods of presentation would not have sufficed, and therefore such substantial expenditures for presentation purposes are not reasonable and necessary to the presentation of the plaintiffs case.

Therefore, the total award of costs to the plaintiffs is five thousand eight hundred seventy-nine dollars and thirty-two cents.

Any questions?

MR. PINE: Your Honor, may I be heard on the order for entry of final judgment as related to Mr. Doire and Virginia Transportation?

THE COURT: Sure.

MR. PINE: I'm sure the Court is familiar with the standard in these types of cases. The judgment against Virginia Transportation and Mr. Doire could have and

very well may have devastating consequences financially for the business and for him. What I am asking for is not a permanent stay or stay for the duration of any appeal, but a more temporary stay with a finite window to that. I'm not sure the Court's aware, but there have been discussions between corporate counsel as well as Mr. Doire's, and they're trying to work things out with his vendors, with everybody that he does business with. This is a company that employs several dozen people, forty or fifty people and obviously including business facilities around the country transporting vehicles, and they're in discussions about what the consequence of this verdict could be for the company. And those discussions are ongoing but have not yet been finalized. We're asking for a stay of entry of final judgment.

THE COURT: Any objections on the part of the plaintiff?

MR. PINE: It would be in the best interest of all parties, frankly irreparable harm for Mr. Doire and Virginia Transportation, but would not put them in any new adverse position in terms of a judgment because judgment is going to enter, it's just a question of when. And it may very well be in the public interest since if Virginia Transportation were to go under, it's highly likely a lot of other people would be adversely

affected. So we're looking for a little bit of a window of time to continue discussions with the parties in the case of Travelers as well as Virginia Transport as well as the Doires, but also with the financial institutions with whom the vendor does business and perhaps even a thirty day stay instead of final judgment would be of great assistance in that regard.

THE COURT: It seems like a reasonable request to me. How does the plaintiff feel? I think Mr. Pine's point seems to be well taken.

MR. DANA: Judge, I was --

THE COURT: What do you think? Any problem with allowing the defendant a thirty day stay, see how things shake out here?

MR. DANA: I guess, on behalf of the plaintiff, my only concern would be to what end would you, I don't mean to sound --

THE COURT: Well, I don't want to be any more involved in the stay other than --

MR. DANA: I'm not asking the Court to, but Mr. Pine did indicate to me outside that he was going to be asking for this. I really haven't had a chance to think about it thoroughly. But Virginia Transportation's assets have been known by both Travelers and his previous counsel for some time, long

before we ever entered the courtroom.

THE COURT: But the verdict wasn't known.

MR. DANA: No, but --

THE COURT: I mean I say that respectfully. My understanding is your client's company is continuing, he is employed. I'm trying to balance everyone's interests. Essentially, he has a substantial soon to be judgment, but he does have employment, his family is not hanging in the balance, so to speak, and we have a defendant who will be substantially impacted by this. I would assume the time may be used to try to figure out if there is a way to resolve the whole thing to everyone's satisfaction without, essentially don't want to put anyone out of business, see if 30 days or some reasonable period can help them put something together that satisfies everyone. Your client, again, this isn't needed to keep his family going for the moment. I am inclined to grant it but if you want --

MR. DANA: If I can be given a little, an idea, some idea as to when judgment would be entered then so we --

THE COURT: Why don't we do this. I am inclined to grant the 30 day stay because I think those reasons were very legitimate, and I don't, I think the prejudice is far greater to the defendant at the moment, or not as

great to your client based on his situation, unless it's different than what was portrayed at trial, his company's still up and running.

MR. DANA: I can't make that representation, Judge.

THE COURT: So knowing that, it's my feeling you can come back in 30 days. If nothing happens in 30 days or it's just kind of hung up during that period, no one is talking to anybody and nothing has been done, then I would probably be not inclined to continue the stay. But on the other hand, if something is going on that is meaningful -- in as much as it's going to keep the party's status quo and whole, you know, if the judgment stands, he gets paid. I mean, that is best for everybody. I just don't think I should be really involved in that any more than I am at the moment. But I think a 30 day stay is reasonable. If you want to come back in 30 days, if you need to discuss it at that time, if you want to revisit Mr. Pine's argument to continue for some legitimate reason, I will hear you at that time.

MR. PINE: That's fine with me.

MR. DANA: My only point, sounds like it's going to be open ended.

THE COURT: No, it's going to be a thirty day stay. Unless they want to extend that.

MR. DANA: And if he doesn't?

THE COURT: Then it terminates after thirty days.

MR. DELUCA: Thirty days from --

THE COURT: I certainly would afford him an opportunity to come back to request it be extended beyond that date.

MR. DELUCA: Just to define or a specific date up until a date upon which the stay expires, can we stay up to and including another thirty --

THE COURT: Sure. That's fine. Any questions?

MR. DANA: No, Your Honor.

MR. D'AMICO: There's a twenty day appeal period after judgment enters. Does it, do we have to affirmatively file an order in the case that day, or is the record, is the court file going to reflect that if nothing is done and that the stay expires, that now that appeal period begins to run and the clock is now moving again?

THE COURT: Well, I think the best way to, with a judgment of this magnitude, I would expect that you come see my clerk and have her enter the judgment that day if they don't seek to extend the stay.

MR. DANA: I will.

THE COURT: She will do the paperwork. You will have your judgment by then. That is what I would

suggest. You are not going to expect us to keep track, we have got a lot of cases going on. It would be whoever comes in, if there is no request for an extension of the stay, come in the next morning and ask Cindy to enter the paperwork for judgment.

MR. DANA: Fair enough.

THE COURT: All right. Court will be in recess.